**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LOUISE BACKUS,**

                                    **Plaintiff,**

        **v.**                                              **3:05-CV-1180**
                                                            **(NAM)**

**MICHAEL J. ASTRUE\*,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                    **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

Lachman & Gorton Law Firm               Peter A. Gorton, Esq.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
*Attorney for Plaintiff*

Glenn T. Suddaby                        William H. Pease, Esq.
United States Attorney for
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Social Security Administration          Barbara L. Spivak, Esq.
Office of Regional General Counsel      Dennis J. Canning, Esq.
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Attorneys for Defendant*

        \*\* On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
        Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
        automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in
        this action.

**NORMAN A. MORDUE, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.        INTRODUCTION**

Plaintiff Louise Backus brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for Supplemental Security Income ("SSI").  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.    BACKGROUND

Plaintiff was born on August 12, 1955 and was 49 years old at the time of the administrative hearing on May 13, 2004. (Administrative Transcript at p. 16, 51).[1]  Plaintiff is separated from her husband and has two teenage daughters.  (T. 414).  Plaintiff has visitation rights with her children and resides with her boyfriend, Leyland Cutting, Jr., in Johnson City, New York. (T. 412, 414, 419).  Plaintiff completed high school in 1976 and was not enrolled in any special education classes. (T. 76).

From May 1999 until April 2002, plaintiff was employed as a cleaner/dishwasher at The River Club Restaurant.[2] (T. 71).  Plaintiff's responsibilities included cleaning, vacuuming, mopping and washing dishes.  (T. 57, 71).  Plaintiff did not supervise any other employees. (T. 71).  Plaintiff was required to walk "all day", stand for 6 hours, stoop/crouch for 4 hours, handle/reach for 5 hours and write for 1 hour during the workday. (T. 57).  Plaintiff's job required her to frequently lift and/or carry 25 to 50 pounds.  (T. 57, 71).  Plaintiff claims she became disabled as a result of a motor vehicle accident that occurred on March 17, 2001.  The last day plaintiff worked in any capacity was January 4, 2002.  (T. 51)

---

[1]  Portions of the administrative transcript, Dkt. No. 4, will be cited herein as "(T.__)."

[2]  The record does not contain any evidence of employment prior to 1999.

**A.      Medical Treatment**

A review of the record reveals that plaintiff received treatment for her alleged disabling conditions from United Health Services Hospital, Saeed Bajwa, M.D., RPA Larry Oney, Southern Tier Pain Management, Chenango Hospital and Sae-Joun Park, M.D.[3]

On March 17, 2001, plaintiff was treated at the Emergency Room of United Health Services Hospital for injuries she allegedly sustained in an automobile accident. (T. 92). The attending physician was Dr. Periakaruppan. (T. 93). Plaintiff stated that she was operating a passenger van with five children when the vehicle slid on black ice into oncoming traffic. (T. 119). Dr. Periakaruppan noted that plaintiff was treated at the scene of the accident for low blood pressure and was taken to the emergency room for complaints of pain in her rib cage. (T. 92). Dr. Periakaruppan also noted that plaintiff sustained a complex laceration to her forehead for which a "debridement and repair" procedure was performed. (T. 94). Dr. Periakaruppan noted that x-rays and a CT scan of plaintiff's chest revealed rib fractures and a CT of plaintiff's pelvis showed a mass of questionable etiology. (T. 92). After receiving treatment in the emergency room, plaintiff was admitted to the Intensive Care Unit for observation. (T. 92). Plaintiff's admitting diagnosis was head injury, laceration of forehead, blunt injury to chest and a fracture of the left first and second ribs. (T. 92). On March 21, 2001, plaintiff was discharged with a prescription for Darvocet-N.[4] (T. 93).

On May 31, 2001, plaintiff was examined by Dr. Bajwa, a neurologist, at the request of

---

[3] The record contains treatment notes and reports for conditions/complaints unrelated to the issues at hand. A summary of those records has been omitted from this discussion.

[4] Darvocet is a mild narcotic analgesics prescribed for the relief of mild to moderate pain, with or without fever. *Dorland's Illustrated Medical Dictionary,* 479 (31st ed. 2007)

Dr. Periakaruppan.  (T. 108).  Plaintiff told Dr. Bajwa about her motor vehicle accident and claimed that she sustained a large laceration over both eyebrows and a brief loss of consciousness. (T. 108).   Plaintiff advised Dr. Bajwa that since the accident, she experienced numbness in the area of the laceration, headaches and an inability to focus. (T. 108).  Upon examination, Dr. Bajwa noted plaintiff had a well-healed scar over her eyebrows with no sign of infection. (T. 109).  Plaintiff's physical examination was unremarkable and her mental status and speech were "normal". (T. 109).  Dr. Bajwa detected some numbness in the forehead region only into the hairline with a "completely unremarkable" cranial nerve examination. (T. 109).   Dr. Bajwa diagnosed plaintiff with numbness in her forehead secondary to injury to the bilateral superorbital nerves and headaches. (T. 109).  Dr. Bajwa recommended that plaintiff continue to take Darvocet and undergo an MRI of the brain. (T. 109).  The MRI was taken on June 7, 2001. (T. 110).  The radiologist's impression was "normal study". (T. 115).

On June 20, 2001, plaintiff returned to Dr. Bajwa for a follow-up complaining of slight numbness and mild dizziness which was "improving".  (T. 110).  Dr. Bajwa noted plaintiff was "doing quite well". (T. 110).  Dr. Bajwa noted that the MRI of plaintiff's brain did not show any acute or old intracranial abnormality. (T. 110).  Plaintiff's neurological examination remained stable and normal with the exception of the numbness in her forehead. (T. 110).  Dr. Bajwa discharged plaintiff from his care. (T. 110).

On November 13, 2001, plaintiff was examined by RPA Larry Oney on behalf of Dr. Bajwa.[5]  RPA Oney noted plaintiff had a "scheduled visit" complaining of significant headaches and dizziness. (T. 111).  Plaintiff stated that she had difficulty watching television, sleeping,

---

[5] RPA is a registered physicians assistant.  *Dorland's* at 2147.

balancing her checkbook and reading for extended periods of time. (T. 111).  Plaintiff also claimed that she experienced headaches and nightmares about the accident. (T. 111).  Upon examination, RPA Oney found plaintiff alert, oriented and cooperative with decreased sensation in the superorbital area. (T. 111).  RPA Oney diagnosed plaintiff with post concussion syndrome and cephalgia.[6] (T. 111).  RPA Oney discussed the diagnosis with Dr. Bajwa and referred plaintiff to Southern Tier Pain Management for rehabilitation. (T. 111).  RPA Oney also prescribed Paxil (as a sleep aid) and Naprosyn.[7] (T. 111).

On December 19, 2001, plaintiff had an initial evaluation at Southern Tier Pain Management upon referral from RPA Oney. (T. 116).  Plaintiff was evaluated by Kevin L. Hastings, D.O. (medical director of Southern Tier Pain Management), Marilyn I. Geller, Ph.D. (program co-director) and J. Todd Mansfield, P.T.  (T. 116).  Plaintiff described her motor vehicle accident and claimed that suffered a loss of consciousness.  (T. 122).  Plaintiff claimed her level of depression was 8 out of 10; quality of life was 9 out of 10; and quality of sleep was 5 out of 10. (T. 117).

Dr. Hastings noted plaintiff's working diagnosis of "post concussive syndrome and cephalgia". (T. 122).  Dr. Hastings noted plaintiff was "currently able to work" but "her stress, marital strain and financial duress have led to depression, anxiety, cognitive deficits, panic and suicidal ideations". (T. 123).  Upon examination, Dr. Hastings noted plaintiff was grossly intact with no focal deficits. (T. 124).  Dr. Hastings' musculoskeletal examination revealed a whiplash

---

[6] Cephalgia is a headache.  *Id.* at 335.

[7] Paxil is used to treat depressive, obsessive-compulsive, panic, and social anxiety disorders; administered orally.  *Id.* at 1405, 1419.  Naprosyn is an anti-inflammatory used in the treatment of pain and inflammation.  *Id.* at 1251.

"strain-counter strain pattern" with restricted range of motion in the cervical and lumbosacral spine. (T. 124). Dr. Hastings diagnosed plaintiff with status post closed head injury, cervical/thoracic/lumbar strain, neuropathy, shoulder strain, post concussive syndrome, muscle tensions, migraines, adjustment disorder with depressed mood and panic, sleep disturbance, post traumatic stress disorder and poor pain control. (T. 125). Dr. Hastings determined plaintiff to be "an excellent candidate for treatment in the pain program". (T. 125). Dr. Hastings noted that plaintiff's therapy would consist of medication, manipulation, trigger point injections, physical, psychological and occupational therapy, hydrotherapy and cognitive skills training. (T. 125).

On December 19, 2001, plaintiff underwent an initial psychological evaluation by Marilyn I. Geller, Ph.D. (T. 141). Dr. Geller noted plaintiff was able to communicate the details of the accident and that plaintiff claimed she was "close to not making it" as a result of her injuries. (T. 139). Plaintiff claimed she suffered from constant headaches, nausea, numbness, pain in her neck and "knots" in her muscles in both shoulders. (T. 119). Plaintiff claimed she had some relief with medications. (T. 119). Plaintiff claimed she could no longer knit, crochet or drive and that her family relations were suffering. (T. 140).

Dr. Geller performed a series of psychological tests including the Beck Depression Inventory and the Beck Anxiety Inventory.[8] (T. 142). Dr. Geller noted plaintiff was "severely depressed". (T. 142). Dr. Geller also concluded that plaintiff experienced "moderate to severe symptoms of anxiety". (T. 143). Dr. Geller opined that plaintiff would benefit from participation in the motor vehicle program. (T. 140).

On December 19, 2001, plaintiff also consulted with a physical therapist, J. Todd

---

[8] The Beck Inventory is a self-report questionnaire for measuring the symptoms of depression and anxiety, focusing on cognitive symptoms. *Dorland's* at.

Mansfield, P.T. (T. 146).  Upon examination, Mr. Mansfield noted plaintiff exhibited a restricted range of motion in her cervical spine, tenderness in her upper trapezius muscles, and decreased strength in the upper quarter. (T. 145).  Mr. Mansfield suggested a therapy program including aquatic and land therapy. (T. 146).

On January 25, 2002, plaintiff returned for a scheduled visit with RPA Oney. (T. 112). Plaintiff complained of difficulties with her thoughts and pain in the third finger of her right hand. (T. 112).  Upon examination, RPA Oney noted "triggering" of the third finger . (T. 112).  RPA Oney's diagnosis was unchanged and he advised plaintiff to continue taking her previously prescribed medications. (T. 112).

From February 2002 until April 2002, plaintiff participated in the "Motor Vehicle Program" at Southern Tier Pain Management.  During that time, plaintiff treated with Dr. Hastings, Donna McCall (an occupational therapist), Nathan Hare, Ph.D., Todd Mansfield, P.T., and Angela Crawford, Ph.D.  On February 4, 2002, plaintiff had her first "Program Day". Plaintiff was initially examined by Dr. Hastings and was given a prescription for Norflex and a sample of Celebrex.[9]  (T. 167).  Plaintiff continued to treat with Dr. Hastings as part of the Program.[10]  During that time, plaintiff continually complained of headaches, neck pain and shoulder pain. (T. 167-178).  Dr. Hastings noted plaintiff had been receiving pain medication from other sources and that "we cannot monitor her correctly" therefore, plaintiff was advised to obtain all of her prescriptions from her "PMD". (T. 171).  On April 1, 2002, Dr. Hastings noted

---

[9] Norflex is a muscle relaxant used for acute spasms in voluntary muscles.  *Dorland's* at 1309, 1358. Celebrex is a nonsteroidal antiinflammatory drug used for symptomatic treatment of osteoarthritis and rheumatoid arthritis.  *Id*. at 317

[10] Although plaintiff completed the Program in April 2002, plaintiff's last visit with Dr. Hastings was June 14, 2002.  (T. 178).

plaintiff was physically improving but that her neurological deficiencies persisted. (T. 174).  Dr. Hastings also stated plaintiff's husband "backed out on coming which is likely part of the problem". (T. 174).

On February 4, 2002, plaintiff was evaluated by Angela Crawford, Ph.D. (T. 263).  Dr. Crawford noted plaintiff was anxious, depressed and distractible. (T. 263).  Plaintiff expressed suicidal ideations but "contracted for safety" (which meant that plaintiff would contact Dr. Crawford or the crisis service if she felt suicidal). (T. 263).  Dr. Crawford provided plaintiff with telephone numbers for BGH (Binghamton General Hospital) Crisis Center. (T. 263).  Dr. Crawford recommended psychotherapy, therapy for coping skills and pain management for depression. (T. 263).

On February 7, 2002, plaintiff was evaluated by Donna McCall, an occupational therapist. (T. 180).  Ms. McCall discussed types of cushions and back supports to provide good alignment for sitting and discussed principles of good body mechanics. (T. 183).  Plaintiff had four sessions with the occupational therapist. (T. 180- 183).

From February 2002 until April 2002, plaintiff received physical therapy, hypnotherapy, biofeedback therapy and participated in group therapy sessions.  Hypnotherapy was administered by Nathan Hare, Ph.D and Dr. Crawford.  (T. 184-200).  Plaintiff underwent hypnotherapy to learn how to effectively cope with persistent pain, for improved sleep and for stress management. (T. 185).  Plaintiff's course of biofeedback therapy was conducted by Dr. Crawford. (T. 231).  The training focused on relaxation for chronic pain management and skill training for relaxed breathing.  (T. 231).  Plaintiff's group therapy sessions were monitored by Dr. Crawford. (T. 248).  Plaintiff received physical therapy from Mr. Mansfield. (T. 201).  Plaintiff complained of

"pinching" in her neck and received treatment from Mr. Mansfield until April 2002 for pain in her neck and left shoulder. (T. 201-230).

On March 18, 2002, plaintiff returned for a follow-up with RPA Oney. (T. 113).  Plaintiff complained of blisters on her scalp, low back pain, right leg pain and hand pain. (T. 113).  RPA Oney noted that plaintiff was being treated by Dr. Hastings for these conditions. (T. 113).  Upon examination, RPA Oney noted superficial abrasions on the frontal aspect of plaintiff's scalp with no blister or masses. (T. 113).  RPA Oney noted the abrasions "appear to be from scratching more than from trauma". (T. 113).  RPA Oney noted persistent triggering of the third finger and good range of motion in the cervical spine. (T. 113).  RPA's Oney's diagnosis remained unchanged. (T. 113).  Plaintiff was advised to continue taking her medications "as before". (T. 113).

On March 19, 2002, Dr. Crawford prepared a Telephone Memorandum regarding an "emergency call" from plaintiff. (T. 277).  Dr. Crawford noted plaintiff expressed suicidal ideals and that Dr. Crawford discussed plaintiff's "verbal contract for safety" and plaintiff agreed to a counseling session later that week.  (T. 277).  Plaintiff indicated that a friend was spending time with her and Dr. Crawford reviewed coping skills for decreasing her anxiety until the appointment. (T. 277).

On March 20, 2002, plaintiff was admitted to UHS Hospital complaining of emotional distress.  (T. 293).  Plaintiff was initially treated in the emergency room and underwent a psychiatric evaluation by Dr. Arun Shah.  (T. 293).  Dr. Shah noted that plaintiff was admitted to the Emergency Observation Beds as "a possible suicide risk". (T. 293).  Dr. Shah noted that plaintiff reportedly "had a knife to her wrist". (T. 293).   Plaintiff provided a history of molestation by her uncle.  (T. 293).  Plaintiff stated that she went to school through high school

and had "normal school years". (T. 293).  Plaintiff stated she was married with two children ages 10 and 14.  (T. 293).   Plaintiff complained to Dr. Shah of stress in her marriage due to her struggles with the insurance company and her in-laws.  (T. 293).  Plaintiff claimed her husband was abusive and unfaithful, her daughter threatened her and that her sister-in-law controlled the family funds. (T. 297).  Plaintiff advised that she worked but was "on disability". (T. 293).   Upon admission, plaintiff was noted as "extremely distraught with pressured speech, over productive and disorganized".  (T. 294).  Plaintiff was diagnosed with adjustment disorder with mixed disturbances, personality disorder, psychosocial stressors and with a GAF of 60-65. (T. 293 - 294).

On the same day, a police officer contacted Dr. Crawford and advised that plaintiff had a knife and threatened to commit suicide. (T. 278).  The officer indicated that a family member or friend had intervened and called the police.  (T. 278).  The officer advised Dr. Crawford that plaintiff was being taken to the BGH Crisis Center for evaluation. (T. 278).  Dr. Crawford telephoned BGH and was advised that plaintiff had been admitted as she continued to feel distressed regarding marital issues. (T. 279).  Plaintiff "felt safer in the hospital" and Dr. Crawford indicated she would contact her in a few days. (T. 279).

On March 21, 2002, Dr. Shah noted plaintiff was had  "calmed down" and was "cooperative and appropriate".  (T. 294).  Plaintiff was discharged and advised to follow with her doctors and to obtain psychiatric help.  (T. 294). Plaintiff contacted Dr. Crawford and stated that she was being discharged to her home but would stay with her brother if she had conflicts with her husband. (T. 280).  Plaintiff told Dr. Crawford that she would return to the pain management program the following week. (T. 280).

On April 5, 2002, plaintiff presented at the emergency room complaining of back pain and stated she had a "nervous break down 3 weeks ago". (T. 310).  Upon examination, plaintiff denied domestic violence and the attending physician opined plaintiff was not a danger to herself or others.  (T. 311).  Plaintiff was diagnosed with acute exacerbation of chronic neck and back pain, anxiety and depression. (T. 311).  Plaintiff pain upon discharge was noted as "2". (T. 311).

On May 20, 2002, plaintiff had her last visit with RPA Oney. (T. 114).  Plaintiff advised that she had been doing "quite well with Dr. Hastings" and felt that her "neuropsych treatments were of great benefit". (T. 114).   Plaintiff stated that she had "less headaches and upper back pain" but now experienced occasional low back pain. (T. 114).  RPA Oney also noted plaintiff was involved in a custody dispute with her husband and continued "to be disabled due to her significant head injury". (T. 114).  RPA Oney noted plaintiff's examination was "essentially unchanged".  (T. 114).  RPA Oney advised plaintiff to continue with her prescriptions and discharged plaintiff from his care. (T. 114).

On December 17, 2003, plaintiff was examined by Dr. Sae-JounPark. (T. 352).  Plaintiff complained of right hip pain. (T. 352).  Dr. Park prescribed Depakote, Darvocet and Zoloft.[11] (T. 352).  On January 15, 2004, plaintiff claimed she had a "small seizure on Depakote". (T. 352).  Plaintiff continued to treat with Dr. Park in January and February 2004 for unrelated conditions. (T. 353).   Plaintiff's last visit with Dr. Park was April 12, 2004.

On April 16, 2004, Dr. Park prepared a Medical Assessment of Ability to do Work-Related Activities. (T. 356).  Dr. Park opined that plaintiff could never lift, carry, climb, balance,

---

[11] Depakote is used in the treatment of manic episodes associated with bipolar disorder. *Dorland's* at 497, 565. Zoloft is used to treat depressive, obsessive-compulsive, and panic disorders. *Id.* at 1724, 2120.

stoop, crouch, kneel or crawl. (T. 356, 358).  Dr. Park further opined that plaintiff could sit, stand

and walk for 1 hour in an 8 hour workday. (T. 357).  Dr. Park concluded plaintiff could

occasionally reach, handle or feel but could never push or pull. (T. 358).

**B.     Consultative Examinations**

     Alan F. Dubro, Ph.D.

On July 9, 2002, Dr. Dubro performed a psychiatric evaluation of plaintiff at the request

of the agency.  (T. 314).  Plaintiff advised Dr. Dubro that she separated from her husband in April

2002 and resided with a boyfriend in Binghamton. (T. 314).  Plaintiff advised Dr. Dubro that she

was placed in foster care as a child after suffering from abuse by a family acquaintance.  (T. 315).

Plaintiff reported that she was psychiatrically hospitalized for one week in the Mental Health

Center in Oneonta in March 2002 at the request of her husband.[12] (T. 315).   Plaintiff claimed that

she suffered from post traumatic stress, flashbacks, headaches, irritable moods, back pain and

nightmares. (T. 315).  Plaintiff admitted that she drove independently and was able to dress,

bathe, prepare food, do laundry, socialize with her friends and shop with significant back pain.

(T. 315-316).

Upon examination, Dr. Dubro noted plaintiff appeared to be in physical discomfort. (T.

315).  Plaintiff maintained eye contact, her speech was fluent and clear and language skills were

adequate. (T. 315).   Dr. Dubro noted plaintiff's attention, concentration and memory skills were

moderately impaired due to limited intellectual functioning. (T. 315).  Plaintiff had difficulty

performing mental arithmetic.  (T. 316).  Dr. Dubro found plaintiff had a verbal IQ of 73; a

---

     [12] The record does not contain any reports or records from the Mental Health Center or any other hospital
or facility in Oneonta.

performance IQ of 64; and a full scale IQ of 65.  (T. 322).  Dr. Dubro opined that plaintiff

experienced difficulty in dealing with stress however, the results of the evaluation "were not

consistent with claimant's allegations". (T. 317).  Dr. Dubro performed standardized tests

including WRAT-III and WAIS-III and found the results to be a "valid".[13] (T. 321).  Dr. Dubro

opined that plaintiff performed in the "mild range of mental retardation" and displayed

"borderline intellectual functioning". (T. 322).  Dr. Dubro concluded that plaintiff did not appear

to be experiencing the impact of a traumatic brain injury.  (T. 317).  Dr. Dubro diagnosed plaintiff

with adjustment disorder with mixed anxiety, depression and borderline intellectual functioning.

(T. 317).  Dr. Dubro advised plaintiff to seek medical treatment for her injuries. (T. 318).

Pranab K. Datta, M.D.

On July 9, 2002, Dr. Datta performed an orthopedic evaluation of plaintiff at the request

of the agency. (T. 324).   Plaintiff complained of radiating neck pain, pain in her shoulders,

thoracic pain and lumbar pain. (T. 324).  Plaintiff advised Dr. Datta that she had an MRI of her

spine taken in March 2002 which was allegedly "abnormal".[14]  (T. 324).  Plaintiff stated she was

able to cook, clean, shop, manage money, socialize with friends, prepare her own meals, do crafts

and take care of her personal hygiene. (T. 325).   Dr. Datta noted that plaintiff was able to disrobe

and climb onto the examination table without assistance. (T. 326).

After an examination, Dr. Datta diagnosed plaintiff with neck and back pain. (T. 326).  Dr.

Datta opined plaintiff had no restriction for sitting, standing or walking and moderate restriction

for lifting and carrying. (T. 326).

---

[13] WRAT is an abbreviation for Wide Range Achievement Test.  WAIS is an abbreviation for the Wechler
Adult Intelligence Scale.  http://www.medilexicon.com (last visited July 5, 2008).

[14] The record does not contain any report of an MRI of plaintiff's spine.

John Cusick, M.D.

On June 16, 2004, Dr. Cusick performed an orthopedic examination of plaintiff at the request of the ALJ. (T. 366).  Plaintiff complained of neck pain radiating to her shoulders and seizure disorder with seizures once or twice a month.  (T. 366).  Plaintiff stated that she was prescribed Depakote for her seizures but that she still operated a vehicle. (T. 366).  Plaintiff also advised that she was told by a physician that she sustained a "loss of brain substance" due to the accident. (T. 367).

Dr. Cusick noted that when plaintiff was asked to do straight leg raising, she developed vertigo and claimed it was "one of her seizures".  (T. 369).  Dr. Cusick diagnosed plaintiff with cognitive defect, musculoskeletal pain syndrome, seizure disorder and probable COPD.[15] (T. 369).  Dr. Cusick opined that plaintiff was capable of sitting, standing, walking, bending, lifting, carrying, handling objects, hearing, speaking and traveling. (T. 369).  Dr. Cusick concluded that due to her seizure disorder "which may be nothing more than positional vertigo", plaintiff could not operate dangerous machinery or work at heights. (T. 369).

Dennis M. Noia, Ph.D.

On July 8, 2004, Dr. Noia performed a psychiatric evaluation of plaintiff at the request of the ALJ. (T. 378).  Plaintiff reported a history of psychiatric hospitalizations in April 2002 at Fox Hospital and February 2002 at Binghamton General Hospital.[16] (T. 378).  Plaintiff advised that she slept normally, had an increased appetite, had normal sexual functioning and denied manic symptoms. (T. 379).  Plaintiff claimed that she suffered from depression, anxiety, dysphoric

---

[15] COPD is an abbreviation for chronic obstructive pulmonary disease.  http://www.medilexicon.com (last visited July 5, 2008).

[16] The record does not contain any reports or notes from Fox Hospital.

moods, crying spells, loss of energy, problems with memory, nightmares and a diminished sense of pleasure and self worth. (T. 379).  Dr. Noia noted that plaintiff was investigated by Child Protective Services in April 2002 and had visitation rights of her children. (T. 379).  Plaintiff stated that she was able to dress, bathe, groom, cook, prepare food, clean, shop, manage money and drive. (T. 380).  During the day, plaintiff socialized with friends, knit, crocheted and watched television. (T. 381).

Upon examination, Dr. Noia found plaintiff's demeanor to be cooperative, her speech was fluent and clear, thought processes were coherent, mood was neutral and she was oriented. (T. 380).  Plaintiff displayed weak arithmetic skills, impaired memory and deficient intellectual functioning. (T. 380).  Dr. Noia administered the WAIS-III test and found that plaintiff had a verbal scale IQ of 65; a performance scale IQ of 60; and a full scale IQ of 64. (T. 384-38 5).   Dr. Noia noted plaintiff was capable of reading, doing arithmetic and writing as "significantly below an age appropriate level". (T. 385).  Dr. Noia diagnosed plaintiff with post traumatic stress disorder and mild mental retardation. (T. 381).  Dr. Noia opined that plaintiff could follow simple instructions, perform simple tasks, was capable of maintaining attention and concentration, attend to a routine schedule, could relate well with others and had difficulty dealing with stress. (T. 381).  Dr. Noia recommended that plaintiff seek treatment and noted that she may need assistance managing money due to her weak arithmetic skills. (T. 381).

On July 8, 2004, Dr. Noia completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (T. 387).  Dr. Noia opined that plaintiff was "seriously limited" in several areas including understanding/memory, concentration/persistence and adaptation. (T. 387-389).

C.      **Residual Functional Capacity ("RFC") Assessments**

On July 16, 2002, a Physical RFC Assessment was prepared by K. Kosty on behalf of the agency.[17] (T. 334).  On August 12, 2002, M. Apacible, M.D. prepared a Psychiatric Review Technique and Mental RFC Assessment. (T. 335-351).  Dr. Apacible's review was based upon Listings 12.02 (organic mental disorders) and 12.04 (affective disorders). (T. 345).   Dr. Apacible noted that plaintiff's IQ of "V=73, P = 64 and F= 65" did not precisely satisfy the diagnostic criteria for an organic mental disorder. (T. 336).  Dr. Apacible found plaintiff suffered from a slight restriction with her activities of daily living and social functioning. (T. 345).  Dr. Apacible opined that plaintiff often exhibited deficiencies in concentration, persistence and pace and displayed one or two episodes of deterioration. (T. 345).

III.    **PROCEDURAL HISTORY**

Plaintiff filed an application for ("SSI") on May 8, 2002. (T. 50).  The application was denied on August 14, 2002.  (T. 26).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on May 13, 2004. (T. 43).  On September 29, 2004, ALJ John R. Tarrant issued a decision denying plaintiff's claim for benefits.  (T. 16-23).  The Appeals Council denied plaintiff's request for review on August 10, 2005, making the ALJ's decision the final determination of the Commissioner. (T. 5).  This action followed.

_____

[17] Plaintiff does not object to the weight afforded to the Physical RFC assessment.  As such, the details of the assessment are not recited herein.

## IV.        ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since the alleged date of disability onset. (T. 17).  At step two, the ALJ concluded that plaintiff suffered from residual pain from injuries sustained in a motor vehicle accident, post concussion syndrome and an adjustment disorder which qualified as a "severe impairments" within the meaning of the Social Security Regulations (the "Regulations").  (T. 18).  At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 18).  At the fourth step, the ALJ found that plaintiff had the following residual functional capacity ("RFC"):

to lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk six hours and sit six hours in an eight-hour work day and push, pull, climb, balance, stoop, kneel and crawl.  Furthermore, she is able to understand, carry out and remember simple instructions, use judgment, respond appropriately to supervision, co-workers, and the usual work situations and deal with changes in a routine work setting.  (T. 21).

The ALJ found that plaintiff's conditions did not prevent her from returning to her past relevant work as a restaurant dishwasher/cleaner.  (T. 22).   Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 22).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues that: (1) the ALJ failed to consider Listing 12.05(C); (2) the ALJ failed to adequately develop the record; (3) the ALJ improperly assessed plaintiff's credibility; (4) the RFC determination is not based upon substantial evidence; and (5) based upon plaintiff's non-exertional limitations, a vocational expert should have been called to testify at the administrative hearing.  (Dkt. No. 9).

## A.    Listing 12.05(C)

Plaintiff argues that the primary basis for her disability is her "emotional, mental and intellectual deficits".  (Dkt. No. 9, p. 5).  Thus, plaintiff asserts that the ALJ's decision should

have included an analysis of the criteria of Listing 12.05(C).[18]   (Dkt. No. 9, p. 7-8).  Plaintiff

acknowledges that Section 12.05(C) requires evidence of mental abilities before age 22 and

concedes that the record contains no such evidence.  However, plaintiff argues that the ALJ failed

to sufficiently develop the record in this regard.  (Dkt. No. 9, p. 8).  Defendant argues that the

record does not contain the "slightest evidence of mental retardation prior to age 22". (Dkt. No.

10, p. 16).  In support, the Commissioner notes that many of plaintiff's treating doctors did not

mention mental retardation. (Dkt. No. 10, p. 17).

Impairments listed in Appendix 1 of the Regulations "are impairments acknowledged by

the [Commissioner] to be of sufficient severity to preclude gainful employment".  *Aviles v.

Barnhart*, 2004 WL 1146055, at *6 (E.D.N.Y. 2004).  If a claimant's condition meets or equals

the 'listed' impairments, he or she is conclusively presumed to be disabled.  *Dixon v. Shalala*, 54

F.3d 1019, 1030 (2d Cir. 1995).  Listing 12.05(C) relates to sub-average intellectual functioning

caused by mental retardation. 20 C.F.R. Pt. 404, Subpt. P, App.1, §12.05(C).  For purposes of

Social Security benefits, as an adult, in order to be considered disabled due to mental retardation

certain criteria are necessary.  *Meashaw v. Chater*, 1997 WL 16345, at *3 (N.D.N.Y. 1997).  To

meet the criteria of Listing 12.05(C), a plaintiff must show: (1) a valid verbal, performance, or

full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or

other mental impairment imposing an additional and significant work-related limitation of

function. *See Keitt v. Barnhart*, 2005 WL 1258918, at *4 (E.D.N.Y. 2005); *see also Meashaw*,

1997 WL 16345, at *3; *see also Alvarado v. Barnhart*, 432 F.Supp.2d 312, 315 (W.D.N.Y. 2006);

---

[18] Plaintiff does not cite to any caselaw in support of this argument. Although not explicitly stated, plaintiff's argument suggests that she objects to the ALJ's failure to discuss Listing 12.05(C) in Steps 2 and 3 of the sequential analysis.

20 C.F.R. Pt. 404, Subpt. P, App.1, §12.05(C).

### 1.    ALJ's Failure to Discuss Listing 12.05(C)

Plaintiff argues that the ALJ did not give any indication whether he considered Listing 12.05(C) or his reasons for rejecting the Listing.  (Dkt. No. 9, p. 8).  The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence. *See Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (internal citations omitted) (holding that the record must demonstrate that the ALJ considered all of the evidence with a discussion of not only the evidence the ALJ relied upon but also the evidence he rejected).  In addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984).  Courts do not hesitate to remand a case for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence at step three. *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).

In *Peck v. Barnhart*, 2006 WL 3775866, at * 4 (10th Cir. 2006), the plaintiff presented evidence of an IQ of 70 and other physical impairments.  In the decision, the ALJ failed to consider the application of Listing 12.05(C). *Id.*  The Commissioner argued that the omission was harmless error because the record lacked any evidence of the plaintiff's adaptive functioning before age 22. *Id.* at *5-6.  The court rejected the defendant's argument and held that in the absence of findings supported by specific weighing of the evidence, the Court could not assess ALJ's conclusion that the appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion. *Id.* at *6.  Consequently, the Court found that the ALJ's "bare conclusion" was "beyond meaningful judicial

review". *Peck*, 2006 WL 3775866, at * 4.

In this case, the ALJ concluded at Step 2 that plaintiff suffered from residual pains from her motor vehicle accident, post concussion syndrome and an adjustment disorder. (T. 18).  The ALJ stated:

> Based upon claimant's rather normal daily activities, the clinical findings of record and the opinions of Dr. Apacible, it is concluded that her post concussion syndrome and adjustment disorder cause no more than slight restriction of daily living and no more than slight difficulty maintaining social functioning.  Furthermore, given her ability to read, do crafts, do word puzzles, watch television, manage her money, crochet and knit, it is concluded she seldom has deficiencies in concentration, persistence of pace.  Hence her impairments are not of Listing severity.  (T. 19).

The ALJ's decision contains no discussion of any specific Listing or the legal standard employed in determining whether plaintiff's impairments satisfy any specific Listing.  It is not clear from the decision which sections of the Listing were considered.[19]   The ALJ cited to and assigned "some weight" to  Dr. Apacible's opinions, plaintiff's daily activities and "the clinical findings of record".  (T. 19).  However, the ALJ did not specify which "clinical findings of record" supported his conclusion and the ALJ failed to discuss the evidence he rejected.  Most importantly, the ALJ's analysis at Steps 2 and 3 does not address the IQ testing performed by Drs. Dubro and Noia.  Moreover, nowhere in the decision did the ALJ even acknowledge Dr. Noia's diagnosis of mild mental retardation or Dr. Dubro's assessment that plaintiff performed in the "mild range of mental retardation".  (T. 19, 20).

Thus, the ALJ failed to employ the correct legal standards at Steps 2 and 3 of the sequential analysis.  The ALJ's failure to specifically address Listing 12.05(C) is, under the facts of this case, reversible error, because the Court cannot engage in meaningful judicial review.  *See*

---

[19] The Psychiatric Review Technique Form prepared by Dr. Apacible considered Listings 12.02 and 12.04. (T. 336).

*Baneky v. Apfel*, 997 F.Supp. 543, 547 (S.D.N.Y. 1998) (holding that remand was necessary as it is unclear whether the ALJ specifically considered 12.05(C) at all);  *see also Smith v. Barnhart*, 2006 WL 467958, at *5 (10th Cir. 2006).

### 2.    ALJ's Duty to Develop Record of Mental Impairments

Plaintiff claims that the ALJ made no attempt to develop the record and determine whether or not plaintiff suffered from mental impairments before age 22.  (Dkt. No. 9, p. 8). Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, the ALJ has an affirmative duty to develop the medical record if it is incomplete. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application ....").  Plaintiff has the burden of "provid[ing] medical evidence" to show she is disabled, but the ALJ has a heightened obligation to assist a *pro se* plaintiff affirmatively in developing the record.  *Carroll v. Secretary of Health and Human Servs.*, 872 F.Supp. 1200, 1204 (E.D.N.Y. 1995); *see also Camacho v. Apfel*, 1999 WL 294731, at *3 (E.D.N.Y. 1999) (citing 20 C.F.R. § 404.1512(c)).

When the plaintiff is unassisted by counsel, the ALJ has the duty to scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts.  *Gold v. Secretary of Health, Educ. and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972).  The ALJ must make "reasonable efforts" to develop the record including issuing and enforcing subpoenas requiring the production of evidence, and advising the plaintiff of the importance of the evidence.  *See Almonte v. Apfel*, 1998 WL 150996, at *7 (S.D.N.Y. 1998).  The ALJ must also enter these attempts at evidentiary development into the record.  *Id*.

In *Rivera v. Barnhart*, 2002 WL 221591, *2 (S.D.N.Y. 2002), the court held that the ALJ failed to adequately develop the record in two respects.  First, the ALJ did not discuss mental retardation in the second and third steps of the sequential analysis.  *Id.*   The decision contained no discussion and no findings concerning one doctor's diagnosis of mild mental retardation.  *Id.* The court held that since the plaintiff appeared *pro se*, the record was not sufficiently developed as to the possible diagnosis of mental retardation.  *Id.*  Second, the court held that the ALJ also failed to develop the record with respect to the IQ test administered by plaintiff's doctors.  *Rivera*, 2002 WL 221591, at *3.  The ALJ failed to obtain other evidence, including prior IQ testing, that would provide a more complete picture of the plaintiff.  *Id.*  Based upon the gaps in the record with respect to information relevant to the second and third steps of the analysis, the court remanded the case to the Commissioner.  *Rivera*, 2002 WL 221591, at *4.

In this case, the ALJ did not attempt to obtain "other evidence" that would bear on the reliability of the testing performed by Drs. Dubro and Noia.  Further, the ALJ failed to attempt to obtain any evidence that would provide a more complete picture of plaintiff to adequately analyze her impairments at the second and third step of the analysis.  There is some evidence in the record indicating that plaintiff may have suffered from deficits in adaptive functioning prior to the age of 22.  Plaintiff's employment history is limited to manual labor and plaintiff was allegedly molested and placed in foster care at age 6.[20] (T. 314-315).  This evidence, when considered in conjunction with the assessments of Drs. Dubro and Noia and the failure of the ALJ to produce any discussion on Listing 12.05(C), warrants remand to the Commissioner.  *See Soverns v. Astrue*, 501 F.Supp.2d 1311, 1315-1316 (D. Kan. 2007).

---

[20] Although the record is devoid of any employment information prior to 1999, Dr. Noia noted plaintiff's prior work experience included "some labor jobs". (T. 382).

**B.      Duty to Develop Record for Hospital Admissions/Counseling**

Plaintiff also argues that the ALJ failed to obtain plaintiff's medical records from plaintiff's "counselor" and records of plaintiff's admissions to Fox Memorial Hospital in Oneonta.  (Dkt. No. 9, p. 4).  Plaintiff also claims that the ALJ failed to develop the record when he refused to allow testimony from her friend, Leyland Cutting, about her condition.[21] *Id*. Defendant claims that the ALJ adequately developed the record and protected the rights of the *pro se* plaintiff. (Dkt. No. 10, p. 16).

The Act requires the agency to make every reasonable effort to obtain all medical evidence necessary to determine a claim. *Rich v. Apfel*, 1998 WL 458056, at *12 (S.D.N.Y. 1998) (citing 42 U.S.C. § 423(d)(5)(B)).  "Every reasonable effort" means that the agency is required to make an initial request for evidence and one follow-up request.  *Rich*, 1998 WL 458056, at *12 (citing 20 C.F.R. § 416.912(d)(1)).  While the ALJ may consider information from non-medical sources in evaluating plaintiff's alleged disability, the ALJ does not have an affirmative duty to elicit testimony from lay witnesses.  *Amodeo v. Chater*, 1995 WL 652473, at *3 (N.D. Cal. 1995) (citing 20 C.F.R. § 404.1513(e)(2)).  Moreover, an ALJ is not required to credit lay witness testimony in the absence of corroborating objective medical evidence.  *See Colwell v. Chater*, 1996 WL 557773, at *4 (6th Cir. 1996); *see also Luteyn v. Comm'r of Social Sec.*, 528 F.Supp.2d 739, 746 (W.D. Mich. 2007) (holding that even if it was error not to hear testimony from plaintiff's girlfriend, it would be harmless error given the lack of objective medical evidence).

In *Guzman v. Califano*, 480 F.Supp. 735, 736 (S.D.N.Y. 1979), the plaintiff argued that remand was proper because the ALJ should have called her daughter as a witness.  The Court

---

[21] Plaintiff does not cite to any caselaw in support of these arguments.

24

disagreed and stated that:

> The ALJ told Ms. Guzman, however, that she could introduce evidence. How much further must (or should) the hearing officer go? As it is, the ALJ questioned petitioner on a number of relevant issues, and found her testimony lacking in credibility. What if the daughter (or any other witness called by a hearing officer) were even less credible? Would it be proper for the denial of relief to rest on the testimony of a relative or other witness called by an administrative judge? Would this be a proper practice also in cases where an applicant has been found believable?

*Guzman*, 480 F.Supp at 736.

In this case, the ALJ satisfied his obligation to develop the record in regard to plaintiff's hospital admissions and alleged "counseling" with Sue Ramachek at UHS. The agency made two attempts to obtain medical records from Fox Memorial Hospital in Oneonta. (T. 84). No response was received from the hospital. (T. 81). Further, the agency made several requests for records from United Health Services Hospital and received two sets of records dated March 2001 and March 2002. (T. 92, 293). However, none of the records from UHS contain any notations or reports from Ms. Ramacheck or any other therapist. The Court also notes that the medical reports from plaintiff's treating physicians and therapists contain no mention of any hospital admission in Oneonta in March 2002 or any mention of treatment with a counselor at UHS.

Plaintiff also argues that the ALJ erred when he refused to allow Leyland Cutting to testify during the administrative hearing about plaintiff's "condition". (Dkt. No. 9, p. 4). The ALJ did not ask Mr. Cutting to testify, however, the ALJ did not refuse to allow Mr. Cutting to testify. Rather, the ALJ "put the ball in [plaintiff's] park". (T. 418). The ALJ further asked: "Is there anything that I have not asked you about that you want to mention and make part of the record?". (T. 419). Plaintiff did not ask the ALJ to consider testimony from Mr. Cutting at that time. Plaintiff now alleges that the ALJ should have called Mr. Cutting as a witness as he would have

provided his "observations". (Dkt. No. 9, p. 5).  Plaintiff has not cited to any caselaw for the proposition that an ALJ must allow third-party testimony.  *See Bronson v. Astrue*, 530 F.Supp.2d 1172, 1185 (D.Kan. 2008) (plaintiff's argument fails as she set forth the bare assertion that her daughter attempted to testify and that the ALJ refused to allow the testimony).  Plaintiff has done nothing more than "object" to the fact that Mr. Cutting did not testify.  Specifically, plaintiff does not proffer that Mr. Cutting would testify that plaintiff's mental impairment has more than a minimal effect on her ability to perform basic work activities.  *See Bronson*, 530 F.Supp.2d at 1185.  Therefore, plaintiff failed to show any prejudice and therefore, the Court finds no error.  Thus, the Court finds that the ALJ adequately developed the record in regard to her hospital admissions and "counseling".

## C.  Credibility

Plaintiff argues that the ALJ failed to properly assess her credibility.  (Dkt. No. 9, p. 9).  Defendant contends that the ALJ's credibility finding was supported by substantial evidence (Dkt. No. 10, p. 24).

It is well settled that "a claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence".  *Simmons v. U.S.R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted).  "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)) .  The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical

findings and other evidence, regarding the true extent of the pain alleged by the claimant."
*Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility).

If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her neck and back pain are consistent with the objective medical and other evidence.  *See* SSR 96-7p, 1996 WL 374186, at *2 (SSA 1996).  A claimant's subjective symptoms must be supported by medical signs or conditions that reasonably could be expected to produce the disability or alleged symptoms based on a consideration of all the evidence.  *Pareja v. Barnhart*,  2004 WL 626176, at *10 (S.D.N.Y. 2004) (concluding that despite plaintiff's subjective complaints, the ALJ noted that several physicians determined that plaintiff could do medium work based on her medical records and on their own evaluations of her test results).  One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.  SSR 96-7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any

other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.

*Martone v. Apfel*, 70 F. Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4).   An ALJ rejecting subjective testimony must do so explicitly and with specificity

to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence.   *Melchior v. Apfel*, 15 F.Supp.2d 215,

219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987))

(citations omitted).

> In this case, the ALJ noted that "[t]he claimant has alleged that she cannot sit or stand

long or reach overhead due to back pain, abdominal pain and weak muscles and vertebrae".  (T.

19).  The ALJ discussed portions of the medical evidence and plaintiff's testimony and

concluded:

> > The claimant's subjective complaints have been considered under the criteria set
> > forth in 20 C.F.R. § 416.929, as well as SSR 96-7p. Given the minimal positive
> > physical and mental status examination findings, the claimant's extensive daily
> > activities and the probative medical opinions, it is not credible that her symptoms are
> > of such intensity, frequency or duration as to preclude all work activity. (T. 21).

> Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ

did not apply the correct legal standard in assessing plaintiff's credibility.  It is unclear from the

record whether or not the ALJ properly considered the factors enumerated in 29 C.F.R. §

404.1529(c)(3)(i)-(iv).  The ALJ discussed the plaintiff's daily activities however, the decision

does not contain any evaluation of the additional factors including plaintiff's medications, other

measures taken to alleviate pain or other treatment.  Plaintiff was prescribed several different

medications and received therapy including hypnotherapy, biofeedback therapy, occupational

therapy, physical therapy and group counseling.  The ALJ did not provide any analysis, or even

acknowledge, plaintiff's various medications and therapies.  Further, the bulk of the medical record consists of documentation from Southern Tier Pain Management and plaintiff's participation in the "motor vehicle rehabilitation program".  The ALJ's decision is devoid of any mention of the program or the treatment plaintiff received from Dr. Hastings, Dr. Geller and other therapists at Southern Tier Pain Management.

Consequently, the Court is left with no basis upon which to determine whether the appropriate legal standards were applied, nor can it evaluate whether the ALJ considered the entire evidentiary record in arriving at his conclusion.  As a result, the Court remands this case for a determination of plaintiff's credibility which must contain specific findings based upon substantial evidence in a manner that enables effective review.

**D.     Residual Functional Capacity**

Plaintiff argues that the ALJ erroneously found no psychological or intellectual deficits despite "overwhelming evidence to the contrary". (Dkt. No. 9, p. 7).  Plaintiff alleges that the ALJ inexplicably rejected the opinions of the consultative examiners despite assigning "considerable weight" to their findings.  *Id*.  The Commissioner contends that substantial evidence supports the ALJ's findings. (Dkt. No. 10, p. 23).

In making a disability determination, the ALJ must consider all of the relevant evidence in the record.  *Twyne ex rel. Johnson v. Barnhart*, 2003 WL 22299198, at * 12 (S.D.N.Y. 2003) (internal citations omitted).  The ALJ may not "pick and choose" excerpts of medical reports that support a denial of benefits and cannot ignore aspects of a medical opinion that are favorable to a plaintiff.  *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983); *Thompson v. Apfel*, 1998 WL 720676, at *6 (S.D.N.Y. 1998).  Rather, the ALJ should reconcile the different aspects of the

evaluation or, at the very least, the ALJ should explain why he rejected portions of the opinions. *See Thompson*, 1998 WL 720676, at *6.

In this case, the ALJ assigned "considerable weight" to the opinions of Drs. Dubro, Datta, Cusick and Noia.  (T. 21).  However, as previously discussed, the ALJ failed to analyze plaintiff's IQ testing performed by Drs. Dubro and Noia and failed to acknowledge Dr. Noia's diagnosis of "mild mental retardation".  The ALJ also failed to explain why he afforded "considerable weight" to the opinions of Drs. Dubro and Noia without addressing the portions of their opinions that are seemingly favorable to plaintiff.  This error must be addressed on remand.  *See Perry*, 339 F.Supp.2d at 487 (holding that the ALJ improperly ignored the opinion of the Commissioner's consultative examiner regarding the plaintiff's heart condition without an explanation).

The Court is remanding this matter for further consideration of plaintiff's mental impairments in regard to Listing 12.05(C) and plaintiff's credibility.  *See* Parts VB and VC. Thus, the Court finds that the record lacks substantial evidence to support the ALJ's conclusion regarding plaintiff's mental health impairments and non-exertional limitations and consequently, her residual functional capacity.   On remand, the assigned ALJ shall re-examine the evidence as to plaintiff's mental impairments consistent with this Order.

**E.      Vocational Expert**

Plaintiff claims that due to her "clear mental impairments" and "taking the Judge's own findings that claimant was limited to remembering simple instructions", a vocational expert should have been called to testify at the administrative hearing. (Dkt. No. 9, p. 8).  The Commissioner contends that the RFC findings are in accord with plaintiff's physical demands of her past work, and therefore, substantial evidence supports the ALJ's determination at step four. (Dkt. No. 10, p. 25).

As discussed *infra*, the ALJ's determination regarding plaintiff's mental health impairments, credibility and RFC is flawed.  On remand, an analysis may require the testimony of a vocational expert regarding the effect that any nonexertional impairments may have on the plaintiff's ability to perform basic work activities.  *See Perry*, 339 F.Supp.2d at 487.   Thus, the Court refrains from analyzing this issue.

## VI.    CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits is **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for an analysis of Listing 12.05(C); to assess plaintiff's credibility consistent with 20 C.F.R. § 404.1529 and Social Security Ruling 96-7; and for further proceedings consistent with this Order, and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit, and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: September 29, 2008
　　　　Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge